KIMBERLY VANOVER,       )
                          )
         Plaintiff,       )
                          )
v.                        )     No.: 3:07-CV-15
                          )          (VARLAN/SHIRLEY)
BILL WHITE, et al.,       )
                          )
         Defendants.     )

## MEMORANDUM & ORDER

Plaintiff Kimberly Vanover ("Plaintiff") filed the present civil action against Bill White ("White"), Joel Cupp, Rowland Cupp, and Elmo Greer & Sons, LLC ("Elmo Greer") (hereinafter collectively referred to as the "Defendants"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Tennessee Human Rights Act, and the Equal Pay Act. Plaintiff also makes claims of sexual assault, extreme and outrageous conduct and intentional infliction of emotional distress, and negligence. Defendants have filed a motion for summary judgment [Doc. 24], which is ripe for determination.

The Court has carefully considered the parties' briefs and supporting materials [Docs. 24, 28, 31, 33] in light of the entire record and controlling law. For the reasons set forth herein, the Defendants' motion for summary judgment [Doc. 24] will be **DENIED**.

## I.    RELEVANT FACTS

In 2004, Elmo Greer successfully bid on a highway construction project located in Tazewell, Tennessee, through the Tennessee Department of Transportation ("Tazewell

Project"). [Doc. 28-2 at ¶ 3.] The project involved grading, drainage, construction of two bridges, and paving on United States Route 25. [*Id.*] According to Defendants, Elmo Greer's contract for the Tazewell Project required it to provide on-the-job training to a certain number of individuals over the life of the contract. [*Id.* at ¶ 4.] Elmo Greer allegedly utilized a training program created by the Tennessee Road Builders Association ("TRBA") to carry out the on-the-job training requirements of the State of Tennessee contract. [*Id.* at ¶ 5.]

After commencement of the Tazewell Project, Plaintiff learned that Elmo Greer was hiring, and she applied for a position with the company. [Doc. 31-2 at 8-9.] On January 4, 2006, Plaintiff was hired as a heavy truck operator, reviewed Elmo Greer's policies, signed the necessary paperwork, and went to work. [Docs. 28-2 at 2-3; 28-10; 31-2 at 8-11, 65.] Plaintiff's direct supervisor was foreman, Kyle Johnson ("Foreman Johnson"). [Doc. 31-2 at 11.] The superintendent of the project was Defendant Rowland Cupp. [Doc. 31-5 at 2.] The superintendent is the leading acting officer on the construction site and has the final authority with respect to the enforcement of affirmative action and sexual harassment policies on the job site. [Docs. 31-4 at 6; 31-5 at 2.]

Plaintiff was hired at a wage rate of $9.65 per hour. [Doc. 31-2 at 12.] According to Plaintiff, she was unaware that her wage rate was paid pursuant to either Tennessee state law or the contract that covered the project, and she did not inquire how her wage rate was set. [*Id.*] Plaintiff further alleges that she was not told that her training period would consist of a total of 1,040 hours, consisting of three stages of training. [*Id.* at 13, 66.] Plaintiff was told

by Rowland Cupp that she would receive a raise to $11.96 per hour upon completion of her training, the same wage rate for other Elmo Greer truck drivers. [*Id.* at 15-16, 63.] To Plaintiff's knowledge, she was the only truck driver paid $9.65 per hour. [*Id.* at 63.] During Plaintiff's employment, Elmo Greer allegedly reported her training hours to the State of Tennessee, though Plaintiff claims unawareness of such reporting. [Docs. 31-2 at 17, 66; 31-3 at 7-44.] On her first day, Plaintiff claims that she observed another driver for two hours, switched places with the other driver, and then operated the truck while being observed by the other driver. [Doc. 31-2 at 10, 68-69.] After riding with another driver for approximately one week, Plaintiff subsequently rode alone and operated the truck by herself thereafter. [*Id.* at 69.] She also contends that she was the lowest paid employee, even though she was not the most recent employee hired by Elmo Greer. [*Id.* at 34.]

During January of 2006, Plaintiff alleges several instances of sexual harassment by her coworker, Defendant White, while at the Elmo Greer job site. [*Id.* at 26.] On one occasion, White allegedly exposed his penis to Plaintiff. [*Id.*] White also allegedly directed the following conduct toward Plaintiff: licking his lips, whistling, grabbing himself, and making gesture with his hands and tongue. [*Id.* at 26-27, 43.] While Plaintiff passed him by in her truck, White allegedly would pull up his shirt, expose his chest, and ask Plaintiff to do likewise. [*Id.* at 27.] Additionally, White allegedly made numerous calls, up to ten or twelve times in one day, to Plaintiff's cell phone and would make comments ranging from "just talking" to asking if she would "go out" with him. [*Id.* at 29.] Plaintiff also describes a "very explicit" cell phone call from White "[a]bout licking my [p-*expletive*] and [f-*expletive*]

3

me and making jokes of it." [*Id.* at 29.] On the same day that White allegedly made this "very explicit" call to Plaintiff, he allegedly wrote a letter to the Plaintiff that another coworker, Darrell Cupp, delivered to her. [*Id.* at 27, 32.] The letter allegedly included a sexually suggestive joke and a sexually explicit poem.[1] [Docs. 31-2 at 31; 31-7 at 4.] According to Plaintiff, she expressed her concerns about sexual harassment to Foreman Johnson, her direct supervisor, by showing him the cell phone history of the calls White made to her and showing him White's letter. [Doc. 31-2 at 11, 29, 33.]

In mid to late January of 2006, an incident allegedly took place on Tennessee State Route 33 ("Route 33"). [Doc. 31-2 at 25.] Though the Tazewell Project included a bridge being built across it, Route 33 was open for public access. [*Id.* at 45.] After work, Plaintiff allegedly drove to a gas station off of Route 33 that White and Defendant Joel Cupp were also patronizing. [*Id.* at 46.] White drove an Elmo Greer vehicle to the gas station because he used it to drive from his home to the job site each day. [Docs. 31-5 at 7; 31-6 at 12.] According to White, he asked Plaintiff for the twenty dollars that she had previously borrowed, which she allegedly repaid him. [Doc. 31-7 at 7.] According to Plaintiff, White and Joel Cupp invited her to leave with them while at the gas station, which she declined.

---

[1]According to Plaintiff, "[i]t said something like roses are red, violets are green or blue or whatever, in between your thighs is where your [p- *expletive*] lies, and that's where he wanted to be or his tongue wished to be or something like that." [Doc. 31-2 at 31.] The letter also included the postscript of "ask me the difference between a city boy and a country boy." [Doc. 31-2 at 31.] According to White, the expressions were "Roses are red, violets are green, I like your legs, I'd like to see what's in between, " "something about 'Born in a mountain, raised in a cave,'" and "The difference between a city boy and a country boy, city boy will walk up and stick it in anything, and the country boy sticks it in then walks up." [Doc. 31-7 at 4.]

[Docs. 31-2 at 47; 28-9 at 8.] After leaving the gas station and returning to Route 33, Plaintiff stopped her vehicle after she found White's vehicle parked across the road. [Doc. 28-9 at 9-10.] White and Joel Cupp allegedly left their vehicle, with White approaching the driver's side of Plaintiff's vehicle and Joel Cupp getting in the passenger side. [*Id.* at 11.] While Joel Cupp asked her to go with them, White allegedly asked to see her breasts, grabbed at her breasts, and tried to raise her shirt himself. [Doc. 31-2 at 48-49.] Joel Cupp then allegedly put his hands in between Plaintiff's legs and said, "Let me feel how warm your [p- *expletive*] is." [*Id.* at 49.] After asking them to stop and leave her alone, White allegedly said they would leave her alone if she would expose her breasts to them. [*Id.*] After refusing, White allegedly asked for a cigarette, and Plaintiff gave him a pack of cigarettes. [*Id.*] According to Plaintiff, White and Joel Cupp then left her. [*Id.*]

The next morning, Plaintiff spoke to Foreman Johnson about the incident on Route 33, who then communicated the incident to Rowland Cupp. [*Id.* at 25, 50.] Rowland Cupp then came to speak to Plaintiff about the incident on Route 33 involving White and Joel Cupp. [*Id.* at 50.] According to Rowland Cupp, Plaintiff repeatedly stated that she did not want to get White or Joel Cupp in trouble. [Doc. 31-5 at 11.] According to Plaintiff, Rowland Cupp stated that he would talk to White and Joel Cupp, left the Plaintiff for about fifteen to thirty minutes, and then returned with Foreman Johnson. [Doc. 31-2 at 50.] According to Rowland Cupp, he spoke to Joel Cupp approximately two to three minutes and cannot recall how long he spoke to White. [Doc. 31-5 at 13.] According to Plaintiff, Rowland Cupp allegedly told her that he had taken care of the problem by instructing White

and Joel Cupp to stay away from Plaintiff and to not speak to her any longer. [Doc. 31-2 at 51.] Rowland Cupp also allegedly stated that he did not want to report the incident to the corporate office and asked her to not mention it to anybody or anybody on the job. [*Id.*] According to Plaintiff, Rowland Cupp stated that if the incident were reported to the corporate office, "we'll all three lose our jobs." [*Id.*] Plaintiff interpreted this as referring to the termination of White, Joel Cupp, and herself. [*Id.*] While Plaintiff claims that Rowland Cupp did not ask her if she wanted to contact the corporate office, he claims that he asked if she wanted to take it further, which she declined. [Docs. 31-2 at 51; 31-5 at 11.] This was the only conversation Plaintiff had with Rowland Cupp regarding the incidents of sexual harassment. [Doc. 31-2 at 25.] The alleged sexual harassment and sexual assault on Route 33 by White and Joel Cupp were not reported to Elmo Greer's corporate office. [Docs. 31-2 at 39, 52; 31-5 at 11.]

After her conversation with Rowland Cupp, Plaintiff claims that she was "treated differently" by White, Joel Cupp, and other coworkers. [Doc. 31-2 at 53.] For instance, Plaintiff claims that Joel Cupp and another coworker, Jared Cupp, would change the position of their loading bucket so that Plaintiff would have to reposition her vehicle up to four times before they would load her truck. [*Id.*] For a few weeks and several times a day, Joel Cupp and Jared Cupp would allegedly drop boulders into the bed of Plaintiff's truck from a higher distance than the norm, jarring her entire body as a result. [*Id.* at 54, 57.] On two to four occasions, Plaintiff claims that some coworkers would block the road with their construction equipment, forcing her to go around them, even though it was allegedly common procedure

for trucks to have the right-of-way. [*Id.* at 56-57, 70.] A couple of times, the loading bucket filled with a mix of slate, dirt, and rock was repositioned over the cab of Plaintiff's truck, and the mixture was dumped to the point where, at least on one occasion, Plaintiff could not open the door to her truck. [*Id.* at 55, 57.] Plaintiff allegedly reported the incident to Foreman Johnson who stated he would tell Rowland Cupp. [*Id.* at 55.] Additionally, Jared Cupp would allegedly give her dirty looks, make obscene hand gestures toward her, and threw a bottle at the windshield of her truck, on one occasion. [*Id.* at 56.] According to Plaintiff, these types of incidents did not occur prior to and were mostly concentrated for about a month after she reported the incident on Route 33 to her superiors. [*Id.* at 58, 70.] According to Plaintiff, she reported most of these incidents to Foreman Johnson either at the end of the day or immediately after they occurred, and he would then allegedly report them to Rowland Cupp. [*Id.* at 58.] Plaintiff allegedly did not receive follow-up from Rowland Cupp, and she did not speak to him directly about the incidents. [*Id.* at 60.] Plaintiff also alleges that Rowland Cupp gave her mean looks, cursed at her, and treated her unfairly after the Route 33 incident, which did not occur previously. [*Id.* at 39.]

In March or April of 2006, White left his job from Elmo Greer because of drug testing. [Doc. 31-7 at 10] According to Plaintiff, she did not experience any overtly sexual harassment problems after White left Elmo Greer's employment, though she claims that she was asked to have sex during lunch by a coworker she can no longer identify on May 15, 2006. [Doc. 31-2 at 20, 35.] Plaintiff did not report this incident to anyone at Elmo Greer. [*Id.* at 21.]

Starting in March or April of 2006, Plaintiff was allegedly sent home from work after being told to do so by Foreman Johnson per orders by Rowland Cupp. [*Id.* at 18, 22.] She was sent home on several occasions in May of 2006. [*Id.* at 18.] According to Plaintiff, there was no reason to send her home because there was work to do, her truck was in working order, and no other employee would drive her truck after she left. [*Id.* at 23.] After asking why she was being sent home, Foreman Johnson allegedly responded that Rowland Cupp was trying to make her quit so that he would not have to fire her. [*Id.* at 18-19.] According to Rowland Cupp, Plaintiff was sent home because he "didn't need her truck or something like that" and cannot recall if other drivers were also sent home. [Doc. 31-5 at 5-6.]

In May of 2006, Plaintiff learned that White was being rehired and decided to end her employment with Elmo Greer. [Docs. 31-2 at 35; 31-7 at 10.] Plaintiff gave a letter to Foreman Johnson and told him that she could no longer work for Elmo Greer. [Doc. 31-2 at 36.] According to Plaintiff, Foreman Johnson expressed how he did not blame Plaintiff for leaving in light of the rehiring of White and Rowland Cupp sending her home from work on several occasions. [*Id.* at 36.]

After her resignation, Plaintiff made her first communication with Elmo Greer's corporate office when she inquired about the proper person to contact about sexual harassment problems. [*Id.* at 37-38.] After being told to contact Lee Anderson ("Anderson"), Plaintiff sent a letter, dated June 15, 2006, explaining the reasons why she left her employment with Elmo Greer. [Docs. 31-2 at 39; 31-3 at 47-48.] After not hearing from

Foreman Johnson, Rowland Cupp, or others at Elmo Greer, Plaintiff filed a charge of discrimination with the Tennessee Human Rights Commission. [Doc. 31-2 at 41.]

## II.   ANALYSIS

### A.  <u>Standard of Review</u>

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* at 249. The judge does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter. *Id.* Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words,

there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

**B.** **Equal Pay Act**

Plaintiff claims that Defendant Elmo Greer compensated male employees at a higher rate than female employees, in violation of the Equal Pay Act ("EPA"). The EPA provides:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

In support of the motion for summary judgment, Defendants contend that this claim must fail because Plaintiff cannot make the prima facie showing that Elmo Greer paid different wages to male employees for substantially the same work. Defendants rely on the fact that Elmo Greer paid other female truck drivers the same rate as male employees, specifically $11.96 per hour. [Doc. 28-8 at 11.] Defendants contend that Plaintiff's lower wage rate of $9.56 per hour was due to her participation in the TRBA on-the-job training program.

Plaintiff counters that Defendant's explanation as to why she was paid at a lower rate is not credible and merely pretextual. In support of this argument, Plaintiff relies on her deposition testimony that she was unaware that she was enrolled in the training program. Furthermore, Plaintiff questions the validity of Defendants' training reports because she contends that her training only lasted one week and the number of hours she reportedly trained was greater than the number of hours she actually worked at Elmo Greer. Plaintiff also argues that she was not treated as a trainee during her employment, as evidenced by the alleged failure to furnish her with a copy of the training program, the lack of updates on her progress within the program, and the failure to classify her as a trainee in payroll records. Plaintiff also argues that the fact other women were paid $11.96 per hour is of no consequence because federal law recognizes that she may be individually discriminated against even though other persons of her sex were not. Thus, Plaintiff contends that there are genuine issues of material fact that preclude summary judgment as to her EPA claim.

Defendants reply that Plaintiff's subjective belief as to her trainee status is immaterial. There is evidence on the record that Plaintiff acknowledged her trainee status. To the extent that Elmo Greer failed to strictly comply with the letter of the State of Tennessee contract, Defendant argues that fact does not alter the fact that Plaintiff was hired as a trainee.

Under the EPA, employers are prohibited from "paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work." *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006) (citing 29 U.S.C. § 206(d)(1)). To establish the prima facie case for an EPA claim, a plaintiff "must show that an employer pays different

wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). The determination of "equal work" is determined on a case-by-case basis and "resolved by an overall comparison of the work, not its individual segments." *Beck-Wilson*, 441 F.3d at 359-60 (citing *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981)).

In the present case, Plaintiff has presented sufficient evidence to satisfy the prima facie case for her EPA claim. It is undisputed that Elmo Greer hired Plaintiff as a heavy truck driver and that she was paid a wage rate of $9.65. [Doc. 28-2 at 2-3.] It is also undisputed that Elmo Greer heavy truck drivers, some of which were men, were paid the normal minimum wage rate of $11.96 per hour. [*See* Docs. 28-2 at 2; 28-3 at 86; 28-8 at 11.] There is also evidence that Plaintiff performed substantially equal work to the hired paid drivers, such as hauling and unloading materials and fueling the vehicles. [*See* Docs. 31-2 at 54-57; 31-3 at 7-48.] Though Defendants argue that the prima facie case has not been established because other female truck drivers were compensated at the higher wage rate, the Supreme Court has held that permitting a company to escape its EPA obligations by agreeing to allow some women to work at a higher rate of pay would "frustrate, not serve, Congress' ends." *Corning Glass Works*, 417 U.S. at 208. Similarly, the Sixth Circuit has held that "complete diversity between plaintiffs and comparators is not required to state a prima facie case under the EPA." *Beck-Wilson*, 441 F.3d at 362. Thus, the fact that some female drivers earned the higher wage rate does not require summary judgment as to Plaintiff's EPA claim.

Once a plaintiff establishes the prima facie case, the defendant bears the burden of proving the wage differential is justified under one of the four affirmative defenses in the EPA: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex. *Corning Glass Works*, 417 U.S. at 196-97. Under the EPA, the plaintiff "never bears the burden of *persuasion* regarding the affirmative defenses." *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 800 n.7 (6th Cir. 1998) (citation omitted). In other words, "the EPA plaintiff need not set forth evidence from which a jury could infer that the employer's proffered reason for the wage differential is pretextual." *Id.* at 499.

In light of these affirmative defenses, Defendants contend that Plaintiff's lower wage rate was due to her participation in a training program, a factor other than her sex. According to Defendants, Elmo Greer's contract with the State of Tennessee provides that trainees would be paid "at least 60 percent of the appropriate minimum journeyman's rate specified in the contract for the first half of the training period, 75 percent for the third quarter of the training period, and 90 percent for the last quarter of the training period . . . [but] in no case will the trainee be paid less than the minimum wage shown in the contract for the classification of laborer." [Docs. 28-2 at 2; 28-4 at 3.] Because Plaintiff was paid the laborer rate of $9.65 per hour during her participation in a training program in accordance with the State of Tennessee contract, Defendants argue that Plaintiff cannot prevail on her EPA claim.

After reviewing the record, there is evidence that Plaintiff was a participant in a training program. Plaintiff's employment application dated January 4, 2006, describes the

position she applied for as "Operator (Training)." [Doc. 28-10 at 1.] There is an "On the Job Training Application" which identifies Plaintiff as a truck driver trainee. [Doc. 31-3 at 2-3.] Furthermore, Plaintiff has testified that Rowland Cupp stated that she would get a raise after completing her training. [Doc. 28-8 at 10.] Furthermore, "bona fide training programs" are recognized as a "factor other than sex which does not offend the equal work equal pay command of the Equal Pay Act." *Odomes*, 653 F.2d at 251. However, the Sixth Circuit has also held that "[t]raining programs which appear to be available to employees of one sex will . . . be carefully examined to determine whether such programs are, in fact, bona fide." *Id.* (citation omitted).[2] For a bona fide training program to constitute a valid exception to the EPA, it "must have substance and significance independent of the trainee's regular job." *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1047-48 (5th Cir. 1973).

In the present case, there is a genuine issue of material fact as to whether the training program had substance and significance or was merely pretextual. For instance, even though Plaintiff was a participant in a training program on paper, Plaintiff testified that she did not receive any training outside of her first week of employment. [Doc. 31-2 at 69.] Furthermore, there are questions as to the substance and significance of Plaintiff's "training" considering that her payroll record indicates that she worked at total of 701 hours for Elmo Greer as of May 27, 2006, yet the training program time report for the same period indicated 749 hours of total training. [Docs. 28-14; 31-3 at 43.] Additionally, there is evidence that

_____

[2]*Odomes*, 653 F.2d at 251, addressed the issue of training programs resulting in higher pay for male trainees.

Defendants did not furnish Plaintiff a copy of the program or "certification showing the type and length of training satisfactorily completed," contrary to the provisions of the State of Tennessee contract. [Docs. 28-4 at 3; 31-2 at 17; 31-3 at 7.] Such evidence raises questions as to whether Elmo Greer's training program was a bona fide training program for EPA purposes and, thus, precludes the grant of summary judgment as the EPA claim.

## C. Title VII/Tennessee Human Rights Act

### 1. Discrimination

Under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Tennessee Human Rights Act ("THRA"), Plaintiff makes claims of wage discrimination and a hostile work environment due to her sex. Title VII provides that it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The THRA has similar provisions regarding employment discrimination. Tenn. Code Ann. § 4-21-401. The Supreme Court of Tennessee has held that "an analysis of claims under the THRA is the same as under Title VII of the Federal Civil Rights Act." *Lynch v. City of Jellico*, 205 S.W.3d 384, 399 (Tenn. 2006). Thus, the Court equally addresses Plaintiff's THRA claims in its discussion of her Title VII claims.

#### a. Wage Discrimination

Plaintiff first claims that Defendant Elmo Greer discriminated against her when she was paid at a lower wage rate than her male counterparts. The Sixth Circuit has recognized

that a "Title VII claim of wage discrimination parallels that of an EPA violation insofar as it incorporates the EPA's affirmative defenses." *Beck-Wilson*, 441 F.3d at 369 (citing *Washington County v. Gunther*, 452 U.S. 161, 167-71 (1981)). Thus, the Sixth Circuit has held that "where the plaintiff defeats the defendant's motion for judgment as a matter of law with respect to her EPA claim by raising a genuine issue as to the defendant's reason for the differential wage, she also defeats their motion for judgment as a matter of law brought against her parallel Title VII claim." *Buntin*, 134 F.3d at 801. In light of the Court's EPA claim discussion, Defendants' motion for summary judgment will be denied as to Plaintiff's Title VII and THRA wage discrimination claims.

> b.   Hostile Work Environment

Plaintiff's second discrimination claim is that she was subjected to a continuous hostile work environment in violation of the federal and state statutes. More specifically, Plaintiff bases her claims on the alleged overtly sexual harassment by Defendant White and other non-overtly sexual harassment by other coworkers and Rowland Cupp. In their motion for summary judgment, Defendants contend that Plaintiff cannot establish that the alleged harassment was severe or pervasive because the alleged acts she complains of occurred over, at most, a two-week period in January of 2006. According to Defendants, the alleged incident on Route 33 cannot support a hostile work environment claim because it occurred off of company property and after work hours. Defendants also contend that Plaintiff cannot establish employer liability because the alleged sexual harassment ended after she reported the incidents to Foreman Johnson and Rowland Cupp.

Plaintiff responds that the alleged conduct was severe or pervasive in light of the totality of the circumstances in this case. From January to May of 2006, Plaintiff contends she experienced harassing acts that ranged from overtly sexual harassment to other acts that were threatening, intimidating, and humiliating. She also argues that Elmo Greer is liable because it failed to take prompt corrective action after she reported the alleged harassment. She also contends that in addition to coworker harassment, she experienced harassment from her supervisor, Rowland Cupp.

To establish the prima facie case based on coworker harassment, a plaintiff must establish that "(1) the sexual harassment was unwelcome, (2) the harassment was based on sex, (3) the harassing behavior was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008). Courts look at the totality of the circumstances in determining whether a work environment is hostile or abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). In evaluating alleged harassing conduct by both an objective and subjective standard, a plaintiff must establish both that "the harassing behavior was 'severe or pervasive' enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive." *Hawkins*, 517 F.3d at 333 (citing *Harris*, 510 U.S. at 21-22). In determining whether alleged harassment is "severe or pervasive, courts consider factors such as "the frequency of the

17

discriminatory conduct; its severity; whether it is physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Summary judgment is proper "only if the evidence is so one-sided so that there is no genuine issue of material fact as to whether there was a hostile work environment." *Hawkins*, 517 F.3d at 333.

In the present case, Defendants argue that Plaintiff cannot show that the alleged harassing conduct was sufficiently severe or pervasive to establish a hostile work environment. They contend that White's alleged overtly sexual harassment occurred over, at most, a two-week period in January 2006 and ceased after Plaintiff reported the Route 33 incident to Rowland Cupp. Defendants also contend that White's alleged acts failed to rise to the level of actionable conduct. Defendants also argue that the non-overtly sexual harassment Plaintiff allegedly experienced after reporting the Route 33 incident to Rowland Cupp cannot support her hostile work environment claim because such acts were not predicated on her sex. They also argue that Plaintiff did not subjectively view the harassment as abusive since she continued reporting to work despite such alleged incidents.

After reviewing the record, the alleged harassment is sufficiently severe or pervasive for summary judgment purposes. Though Defendants contend that White's alleged acts do not rise to the level of actionable harassment, the Court is guided by recent Sixth Circuit precedent. In *Hawkins*, the Sixth Circuit found crude requests for oral sex, solicitations of a sexual relationship, unwanted physical contact, crass and sexual references to a plaintiff's private body parts, and other inappropriate behavior like winking and blowing kisses

18

sufficiently severe or pervasive. *Id.* at 334. Similarly in the present case, White, while at the job site, allegedly: (1) licked his lips at Plaintiff; (2) whistled at her; (3) grabbed himself; (4) asked to see Plaintiff's breasts; (5) made a gesture with his hands and tongue toward Plaintiff; (6) made repeated phone calls to her cell phone during work hours asking her to go out with him ; (7) exposed his penis to Plaintiff; (8) sent a sexually suggestive note to the Plaintiff; and (8) made other sexually explicit comments. [Doc. 31-2 at 26-34.]

Additionally, the non-overtly sexual conduct alleged by the Plaintiff also goes toward establishing severe or pervasive harassment. In *Williams v. Gen. Motors Corp.*, the Sixth Circuit expressly held that "[*a*]*ny* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile work environment in violation of Title VII." 187 F.3d 553, 565 (6th Cir. 1999) (emphasis in original). In the present case, acts by Plaintiff's coworkers such as dropping boulders from a high distance into Plaintiff's truck, repositioning the loading bucket, failing to give her the right-of-way, throwing bottles at her windshield, and burying her cab in a dirt mixture only occurred after she reported the alleged sexual assault on Route 33 to Rowland Cupp. [Doc. 31-2 at 53-58.] Additionally, construing all facts and inferences in a light most favorable to Plaintiff, the non-overtly sexual harassment would not have occurred had she not been a female subjected to alleged overtly sexual harassment and subsequent assault by her coworkers. Given the totality of the circumstances standard, the Court is unpersuaded by Defendants' argument that the harassing conduct was too short in duration to constitute a hostile work environment. Accordingly, the Court finds that there

is sufficient evidence to satisfy the severe and pervasive element of the prima facie case and the harassment was based on sex.

The Court notes that the Sixth Circuit has "not decided whether off-premises harassment by a coworker may be considered as part of the severe or pervasive test under Title VII's sexual harassment provisions." *Hawkins*, 517 F.3d at 335. Other courts have held that "generally an employer is not liable for the harassment or other unlawful conduct perpetrated by a non-supervisory employee after work hours and away from the workplace setting." *Duggins v. Steak 'N Shake, Inc.*, 3 F. App'x 302, 311 (6th Cir. 2001). Nevertheless, "when an employee is forced to work for, or in close proximity to, someone who is harassing her outside the workplace, the employee may reasonably perceive the work environment to be hostile." *Id.* In *Duggins*, the Sixth Circuit found that an alleged rape of a plaintiff that occurred off-premises and after hours failed to establish a hostile work environment when the plaintiff never worked with her alleged rapist either before or after the alleged incident. *Id.* In contrast, Plaintiff continued to work with Joel Cupp after the incident on Route 33, as evidenced by the difficulties he allegedly caused her at work by moving the loading bucket and dropping boulders from high distances into her vehicle. [Doc. 31-2 at 53, 57.] Thus, Plaintiff has sufficiently shown that the incident on Route 33 contributed to her hostile work environment because she continued to work in close proximity to at least one of the coworkers who allegedly sexually assaulted her.[3]

---

[3]Even if the Route 33 incident were not considered as to Plaintiff's hostile work environment claim, her remaining allegations and supporting evidence of on-the-job harassment are sufficient to overcome summary judgment.

Though Defendants contend that Plaintiff's behavior after the alleged sexual harassment shows that she did not perceive the work environment as abusive, there is evidence that she continued to report incidents of perceived harassment to Foreman Johnson after they happened. Construing all facts and inferences in a light most favorable to Plaintiff, complaining about such conduct indicates that she did view those acts as abusive. To the extent her other behavior suggests otherwise, there is a genuine issue of material fact.

After establishing a hostile work environment, "an employee alleging sexual harassment by a coworker must still establish that the employer is liable because it knew or should have known of the harassment, yet failed to take prompt and appropriate corrective action." *Hawkins*, 517 F.3d at 338. In other words, an employer is not liable for "mere negligence," but it is liable "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Id.* (quoting *Blankenship v. Parke Care Ctrs.*, Inc., 123 F.3d 868, 872-73 (6th Cir. 1997)). In the present case, Defendants contend that Rowland Cupp sufficiently addressed Plaintiff's complaint because there were no incidents of overtly sexual harassment after he spoke to White and Joel Cupp about the Route 33 incident.

The Court finds that Plaintiff has presented sufficient evidence to establish the employer liability element of the prima facie case. There is evidence that Elmo Greer knew of the harassment by Plaintiff's coworkers because she reported the incidents to Foreman Johnson, her direct supervisor. As to the response to these complaints, Elmo Greer had a sexual harassment policy in place during the relevant period, but Rowland Cupp did not

21

remember Elmo Greer's sexual harassment policy when asked to describe it at his deposition even though he was responsible for enforcing the sexual harassment policy as superintendent. [Doc. 31-5 at 9.] There is also evidence that Elmo Greer's sexual harassment policy was not followed when Plaintiff reported White's alleged overtly sexual harassment at the job site and during work hours to Foreman Johnson. The policy provides that "[w]hen a charge of harassment is made, and [sic] investigation will be conducted." [Doc. 28-13 at 10.] There is no record of investigation of White's conduct or that disciplinary action occurred as to the alleged on-the-job harassment. Though Defendants contend that Elmo Greer sufficiently addressed her concerns after she reported the Route 33 incident, there is evidence that Plaintiff experienced incidents of non-overtly sexual harassment after the Route 33 incident, which continued even after she reported them to Foreman Johnson. [Doc. 31-2 at 58.] Additionally, it is unclear whether Rowland Cupp's responses to Plaintiff's complaints were reasonable. For example, Rowland Cupp testified that the extent of discipline after the Route 33 incident was speaking to Joel Cupp for "[a]bout two or three minutes or something." [Doc. 31-5 at 13.] Though Defendants have presented evidence of Plaintiff's insistence on not reporting the Route 33 incident to the corporate office, there is other evidence indicating that she did not report it because Rowland Cupp told her "we'll all three lose our jobs." [Docs. 31-2 at 51; 31-5 at 11.] Given the conflicting nature of such evidence, it is for the jury to determine which evidence is more credible and persuasive.

In light of the evidence discussed above and the Court's obligation to construe all facts and inferences in a light most favorable to Plaintiff, there is sufficient evidence to preclude summary judgment as to Plaintiff's hostile work environment claim.

## 2.    Retaliation

A Title VII plaintiff may establish retaliation by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Direct evidence "requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Id.* at 544. In the present case, Plaintiff has not presented direct evidence of retaliation, such as an explicit statement from Elmo Greer that she was being retaliated against in response to her complaints. *See id.* Rather, she has advanced a retaliation claim based on circumstantial evidence. To establish the prima facie case of retaliation for a Title VII claim based on circumstantial evidence, a plaintiff must establish that "(1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Hawkins*, 517 F.3d at 345. The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *Imwalle*, 515 F.3d at 544 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Then, plaintiff "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a

pretext for discrimination." *Burdine*, 450 U.S. at 253. In the present case, it is undisputed that Plaintiff has satisfied the first two elements of the prima facie case for her retaliation claim. Plaintiff engaged in protected activity that the employer knew of due to her reporting of the incidents of alleged harassment to Foreman Johnson, her direct supervisor. Additionally, Plaintiff's discussion of the Route 33 incident with Rowland Cupp further establishes the first two elements of the prima facie case.

Based on the record before the Court, Plaintiff has also presented sufficient evidence to satisfy the adverse employment action element. Plaintiff claims that her coworkers' retaliatory conduct and Rowland Cupp's acts of sending her home from work were adverse employment actions. According to the Sixth Circuit, a "materially adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007). Job changes must be more than "a mere inconvenience or an alteration of job responsibilities." *Id.* Examples of material adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* In the present case, sending Plaintiff home from work would constitute an adverse employment action because such acts would result in a significant change in benefits, namely, losing compensation as an hourly worker each time she was sent home from work early.

The Sixth Circuit has also recognized that an employer is liable for coworker retaliation if (1) the coworker's retaliatory conduct is sufficiently severe as to dissuade a reasonable worker from making or supporting a charge of discrimination; (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior; (3) and supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances. *Hawkins*, 517 F.3d at 347. In the present case, the retaliatory conduct of Plaintiff's coworkers was sufficiently severe. Due to the physical nature of acts such as dumping dirt over Plaintiff's cab, dropping boulders from high distances that jarred Plaintiff's body, and throwing a bottle at the Plaintiff, there is sufficient evidence that such acts were severe enough to dissuade a reasonable worker from making or supporting a charge of discrimination. *See id.* at 334 (discussing how acts involving an "element of physical invasion" as more severe than comments alone in the context of harassment). Also, Elmo Greer had knowledge of the coworker conduct because, as Plaintiff testified, she reported these incidents to her immediate supervisor, Foreman Johnson. Additionally, the lack of response to Plaintiff's complaints to Foreman Johnson is sufficient to establish "indifference or unreasonableness under the circumstances." *Id.* at 347.

Plaintiff also claims that her resignation in May of 2006 constituted a constructive discharge. "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of

forcing the employee to quit and the employee must actually quit." *Tepper*, 505 F.3d at 514 (citations omitted). In light of the evidence showing coworker retaliation, lost compensation from being sent home early, and the imminent return of White after he allegedly failed to receive discipline for his sexually harassing conduct previously, Plaintiff has made a sufficient showing for her claims of constructive discharge for summary judgment purposes.

In their motion for summary judgment, Defendants contend that Plaintiff's retaliation claim must fail because Plaintiff has failed to establish the causal connection element between her resignation in May of 2006 and the reporting of sexual harassment in January of 2006. The Sixth Circuit has recognized that temporal proximity between an adverse employment action and when an employer learns of a protected activity is sufficient evidence for the causal connection element to satisfy the prima facie case of retaliation. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). When "some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* In the present case, even though Plaintiff did not resign immediately after reporting the Route 33 incident, her resignation still occurred within a matter of months. Furthermore, she has presented "other evidence of retaliatory conduct" that were more temporally proximate to her reporting of the Route 33 incident, namely the alleged coworker retaliation and Rowland Cupp sending her home early from work. [Doc. 31-2 at 53.] Additionally, Plaintiff has presented evidence that Foreman Johnson told her that she was being sent home so that she would quit rather than being fired.

[Doc. 31-2 at 19.] Other evidence of retaliatory conduct includes Rowland Cupp's animosity toward Plaintiff, such as referring to Plaintiff as "You [g- *expletive*] stupid [b-*expletive*]" and telling her to "[g]et the [f-*expletive*] out of my way" on at least one occasion after she reported the Route 33 incident. [Doc. 28-9 at 4.] In light of such evidence, Plaintiff has satisfied the prima facie case for her retaliation claim.

The burden then shifts to Defendant to articulate a legitimate, non-discriminatory reason for its actions. Defendants contend that Plaintiff was sent home early from work because Rowland Cupp "didn't need her truck or something like that." [Doc. 31-5 at 5.] The burden then returns to Plaintiff to establish that the Defendants' reason is mere pretext.

A plaintiff can meet the burden of establishing pretext by presenting evidence that (1) the employer's proffered reason has no basis in fact; (2) the proffered reason did not actually motivate the adverse employment action; or (3) the proffered reason is insufficient to explain the adverse employment action. *See Allen v. McPhee*, 240 S.W.3d 803, 823 (6th Cir. 2007). In the present case, there is sufficient evidence of pretext. First, Plaintiff has presented evidence that Foreman Johnson believed that she was being sent home early so that she would resign from Elmo Greer. The Court notes that this belief is distinguishable from "'[m]ere personal beliefs, conjecture and speculation . . . insufficient to support' a triable factual inference" because this belief came from her immediate supervisor, not her own "naked speculation." *Ross v. Duggan*, 402 F.3d 575, 588 (6th Cir. 2004) (citation omitted). Though Rowland Cupp testified that she was sent home one day during the week of May 13, 2006, because her truck was not needed, he could not explain why Plaintiff, rather than any

other driver, was sent home.  During the week of May 20, 2006, Plaintiff was again sent home, which Rowland Cupp could not explain why.  [Doc. 31-5 at 6.]  Plaintiff has also presented evidence that trucks were needed everyday and "had to be going continuously all the time." [Doc. 31-2 at 23.]  Such evidence raises questions whether Elmo Greer's proffered reasons for sending Plaintiff home have basis in fact, actually motivated her being sent home, or are sufficient to explain her being sent home from work early.  Because Plaintiff has presented sufficient evidence of pretext, the Court will deny Defendants' motion for summary judgment as to the retaliation claim.

**D.      Common Law Claims**

**1.      Workers' Compensation Exclusivity**

The Tennessee Workers' Compensation Act provides:

> The rights and remedies granted to an employee subject to the Workers' Compensation Law, compiled in this chapter, on account of personal injury or death by accident, . . . shall exclude all other rights and remedies of such employee . . . on account of such injury or death.

Tenn. Code. Ann. § 50-6-108.  Based on this statute, Defendants contend that Plaintiff's common law claims of sexual assault, extreme and outrageous conduct and intentional infliction of emotional distress, and negligence are barred by the exclusivity provision of the Tennessee Workers' Compensation Act ("TWCA").  Tenn. Code. Ann. § 50-6-108(a).  Plaintiff responds that employers can be sued at common law for intentional torts.  As for the individual defendants, Plaintiff argues that the TWCA provides no protection for a co-

employee that injures a plaintiff.  Defendants reply that Plaintiff has presented no evidence to support claims that Elmo Greer committed any intentional tort.

For the TWCA to be applicable, there is a two-pronged test: (1) the injury arose out of a plaintiff's employment and (2) the injury occurred during the course of a plaintiff's employment.  *Hill v. Eagle Bend Mfg., Inc.*, 942 S.W.2d 483, 487 (Tenn. 1997).  In the present case, Defendants have raised the exclusive workers' compensation remedy as an affirmative defense.  Under Tennessee law, Defendants bear the burden of "conclusively establish[ing] an affirmative defense" at the summary judgment stage.  *See Blair v. West Town Mall*, 130 S.W.3d 761, 767 (Tenn. 2004) ; *Douglas v. E & C Carroll Enters., Inc.*, No. 03A01-9606-CV-00283, 1997 WL 45343, at *7 (Tenn. Ct. App. Feb. 6, 1997).  In the present case, the Plaintiff makes four common law claims against the Defendants, which the Court will address in turn.

a.    Sexual Assault

Plaintiff claims that White and Joel Cupp are liable for sexual assault based on the Route 33 incident and that Elmo Greer is vicariously liable for their actions.  Defendants contend that this claim is barred due to the TWCA.  Applying the two-pronged test, the Court finds that the sexual assault falls outside the scope of the TWCA exclusivity provision.  The Tennessee Supreme Court has described the "in the course of" prong as referring to the time and place of an injury.  *Anderson v. Save-A-Lot, Ltd.*, 989 S.W.2d 277, 279 (Tenn. 1999).  In other words, "an injury by accident to an employee is 'in the course of' employment if it occurred while he was performing a duty he was employed to do."  *Id.* at 280.  Thus,

incidents occurring while on the employer's premises, during work hours, and while performing duties on behalf of the employer satisfy the "in the course of" prong. *See id.* at 279.

In the present case, the alleged sexual assault occurred after work hours and on a road open to public access, so the time and place requirements of the "in the course of" prong have not been satisfied. Furthermore, Plaintiff was not performing duties on behalf of the employer at the time of the alleged assault, rather she was undertaking personal tasks of refueling her vehicle and driving home on a public road. Thus, the sexual assault claim fails to satisfy "in the course of" prong, and her claim falls outside the scope of the TWCA's exclusivity provision.

      b.    <u>Outrageous Conduct and Negligence Claims</u>

Plaintiff's other state law claims allege tort liability for extreme and outrageous conduct and intentional infliction of emotional distress ("outrageous conduct") and negligent infliction of emotional distress against White, Joel Cupp, and Elmo Greer based on conduct during Plaintiff's employment. Plaintiff also alleges that Elmo Greer is liable for negligent hiring, training, and supervision of its employees. In other words, Plaintiff makes several common law claims associated with the alleged sexual harassment by her coworkers. Applying the two-pronged test discussed above, these common law claims satisfy the "in the course of" prong. In *Anderson*, the Tennessee Supreme Court found that the "in the course of" prong was satisfied when incidents of alleged harassment "occurred while Anderson was on the premises of Save-A-Lot, performing duties on behalf of her employer." *Anderson*,

989 S.W.2d at 279. Similarly in the present case, the evidence shows that much of the harassment Plaintiff allegedly experienced over five months occurred at the Elmo Greer job site during work hours.[4]

As to the "arising out of" prong, "an injury arises out of employment 'when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work [was] required to be performed and the resulting injury.'" *Id*. at 280. (citations omitted). In other words, an injury "arising out of" employment refers to an injury "caused by a hazard incident to such employment." *Id.* Tennessee courts have recognized that incidents driven by purely personal motivations tend to fall outside of the scope of the TWCA. *Brimhall v. Home Ins. Co.*, 694 S.W.2d 931, 932 (Tenn. 1985) ("It is the general rule that 'an injury arising from an assault on employee committed solely to gratify his personal ill-will, anger, or hatred, or an injury received in a fight purely personal in nature with a fellow employee, does not arise out of the employment within the meaning of the workmen's compensation acts.'" (emphasis omitted) (citation omitted)). In *Anderson*, an employee filed a workers' compensation complaint against her employer, alleging emotional injuries resulting from sexual harassment by her manager. *Anderson*, 989 S.W.2d at 278. The Tennessee Supreme Court concluded that the plaintiff failed to demonstrate that her alleged injury arose out of her employment when the evidence showed that the manager's purported activity was motivated by "a personal perverse sexual

_____

[4]The "in the course of" prong would not be satisfied to the extent these common law claims are based on the Route 33 incident for the reasons discussed as to Plaintiff's sexual assault claim.

desire" or by a "demented animosity to control and humiliate" the plaintiff and was not related to furthering the business of the employer. *Id.* at 288.

As an initial matter in the present case, the fact Plaintiff was exposed to White and Joel Cupp during the course of employment is not dispositive. *See id.* at 288. The record shows that some of White and Joel Cupp's alleged acts of harassment were motivated by "personal perverse sexual desire" or a "demented animosity to control and humiliate" the Plaintiff. *Id.* These alleged acts include White exposing his penis to Plaintiff, licking his lips, grabbing himself, gesturing with his tongue and hands in a sexually suggestive manner, and sending Plaintiff a letter with sexual content. Neither the record nor Plaintiff's allegations suggest that these alleged acts were related to furthering Elmo Greer's business or that such conduct had a connection with fulfilling Plaintiff's responsibilities of employment. *See id.*

Arguably, other acts such as dropping boulders from high distances during loading and burying Plaintiff's cab in a dirt mixture arose out of Plaintiff's employment as a heavy truck driver. In *Brimhall*, a plaintiff's injury did not "arise out of" his employment when it was a result of an altercation over personal handwash, even though the employer required them to wash their hands, because the encounter was a personal matter over personal property. 694 S.W.2d at 933. Likewise, the allegations and deposition testimony in this case indicate that the alleged conduct was a result of White and Joel Cupp's personal motivations, either perverse sexual desire or personal animosity toward Plaintiff, unrelated to furthering Elmo Greer's business. Given the interrelated nature of the alleged on-the-job harassment

to Plaintiff's common law claims, the Court is guided by the Tennessee Supreme Court's holding that "sexual harassment is completely outside the contemplation of the workers' compensation scheme, and employers should not be allowed to use the exclusive remedy provision as a shield to avoid liability for permitting sexual harassment to occur in the workplace." *Anderson*, 989 S.W.2d at 290. In other words, "sexual harassment [and associated claims] should not and cannot be recognized as a 'risk' inherent in any work environment" and, thus, does not meet the first prong of the test. *Harman v. Moore's Quality Snack Foods, Inc.*, 815 S.W.2d 519, 527 (Tenn. Ct. App. 1991) (citation omitted). Because the two-pronged TWCA test has not been satisfied, Plaintiff's state law claims are not barred by the TWCA's exclusivity provision.

### 2. Outrageous Conduct Claim - Prima Facie Case

The Tennessee Supreme Court has recognized three essential elements for an outrageous conduct claim. These elements are: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). In support of their motion for summary judgment, Defendants contend that Plaintiff has failed to establish the latter two elements. Plaintiff responds that subjection to months of egregious and outrageous conduct, including an assault by coworkers, sufficiently satisfies the outrageous conduct element. Plaintiff further argues that the record reveals sufficient emotional harm or injury, as evidenced by her entering counseling in 2006.

The Tennessee Supreme Court has recognized that the "outrageous conduct requirement is a high standard which has consistently been regarded as a significant limitation on recovery." *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 39 (Tenn. 2005). The "outrageousness requirement is an 'exacting standard' which provides the primary 'safeguard' against fraudulent and trivial claims." *Id.* (citing *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999)). Under this standard, "[i]t has not been enough that defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Bain*, 936 S.W.2d at 623 (citations omitted). "[M]ere insults, indignities, threats, annoyances, petty oppression or other trivialities" fail to constitute outrageous conduct. *Levy v. Franks*, 159 S.W.3d 66, 83 (Tenn. Ct. App. 2004).

In the present case, Plaintiff bases her outrageous conduct claim on a series of acts that occurred over a five-month period. The alleged conduct includes being exposed to phone calls, comments, a letter, and hand gestures either sexually explicit or suggestive in nature. Other acts include coworkers burying her truck cab in a dirt mixture and dropping boulders from high distances into her vehicle. Additionally, Plaintiff alleges conduct where she was stopped on a public road by two coworkers after work who tried to expose her breasts and grabbed her body despite Plaintiff asking them to leave her alone. Plaintiff also alleges that Elmo Greer failed to properly respond to these incidents. In light of all these alleged acts, the Court finds that Plaintiff has satisfied the outrageous conduct element.

Tennessee courts have recognized that an entire course of conduct can give rise to outrageous conduct claims when "[t]ogether, they rise to the level of behavior beyond all possible bounds of decency, and utterly intolerable in a civilized community." *Levy*, 159 S.W.3d at 83 (citations omitted). Thus, even though the individual alleged incidents in this case may fail to rise to the level of outrageous conduct, their cumulative effect is sufficient to satisfy the outrageous conduct element for summary judgment purposes.

Defendants also argue that Plaintiff has failed to satisfy the serious mental injury element. The Tennessee Supreme Court has recognized that a "'serious' or 'severe' emotional injury occurs 'where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'" *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996) (citations omitted). Emotional distress "includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." *Nairon v. Holland*, No. M2006-00321-COA-R3-CV, 2007 WL 626953, *7 (Tenn. Ct. App. Mar. 1, 2007) (citation omitted). Notably, "[i]t is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." *Id.* (citation omitted). In the present case, Plaintiff has presented evidence that she sought counseling at Cherokee Health Systems "[f]or all the problems that I had that I felt burdened with" including "[p]roblems with Elmo Greer" in the Spring or Summer of 2006. [Doc. 31-2 at 61.] She has also testified to feeling upset about the rehiring of White and crying as a result of the Route 33 incident. [Doc. 31-2 at 35, 49.]

Because all facts and inferences are construed in Plaintiff's favor at this stage, she has presented sufficient evidence of severe mental injury for summary judgment purposes.

## III.    CONCLUSION

For the reasons set forth herein, Defendants Bill White, Joel Cupp, Rowland Cupp, and Elmo Greer & Sons, LLC's motion for summary judgment [Doc. 24] is **DENIED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE